# CHARLESTOWN.

## KABLE v. MITCHELL ET ALS.

### September 11, 1876.

1. In sales made by commissioners under decrees, and, orders of a court of equity, the purchasers who have bid off the property, and paid their deposits in good faith, are considered as having inchoate rights, which entitle them to a hearing, upon the question, whether, the sale shall be set aside. And if the court errs, by setting aside the sale improperly, they have the right to carry the question by appeal to a higher tribunal.

2. A sale by commissioners made under a decree of a court of equity, is not an absolute sale in the State of West Virginia, and does not became absolute until it is confirmed by the court.

3. The court may, in the exercise of a sound discretion, either affirm, or set aside, the sale, where from the facts, evidence, and circumstances before it, it appears clearly that the sale was made at a greatly inadequate price, and the court may solve the question upon affidavits, or depositions in connection with the fact that a greatly larger price is offered to the court for the land, and, secured or offered to be secured, or, it may set the sale aside upon any evidence, or fact, or facts before it, which clearly shows that the land sold at a greatly inadequate price.

4. There is no inflexible rule in this State, fixing any specific amount of per cent. required to be offered in advance of the last bid made at the sale, to authorize the court to set aside the sale; the amount of per cent. that should be required in such case, must, to a very great extent, depend upon the amount of the last bid, and the circumstances of the case. Each case should be determined according to its merits.

5. The offering to the court of a large amount in advance of the price bid, to be secured, either by the amount offered into court

or giving bond with good security as was done in this case, is generally the very best evidence of the great inadequacy of price bid at the sale. And the offer in this case being $11.52½ per acre in advance of the sale bid, was sufficiently large to justify the court in setting aside the sale made by the commissioners, the tract of land containing about one hundred and one acres.

6. The bill made by the purchaser at this sale must be considered as his offer to the court through its commissioners, and in making it, he agrees to be bound thereby if it is accepted and approved by the court, and it is discretionary with the court whether it will accept the bid and confirm the sale or set it aside. But this discretion is not an arbitrary one—it should be correctly exercised, and is liable to review by an Appellate Court in a proper case.

7. The discretion which the court may exercise in such cases will not authorize it to set aside the sale without sufficient cause, and a greatly inadequate price is, among other things, a sufficient cause.

8. Where the circuit court has disapproved, and set aside, such sale made by its own commissioners, the Appellate Court should not disturb the action of the circuit court, unless, it plainly appears that there is error to the prejudice of the appellant.

Upon an appeal from the decree of the circuit court of Jefferson county, rendered on the first day of November, 1873, in a cause therein pending, in which Leonard Sadler's administrator was complainant, and Francis W. Drew *et al.* were defendants, the said decree being rendered upon a motion made by Mitchell to set aside a sale of land made by the commissioners of said court.

The appeal was granted on the petition of said Kable, the purchaser at the sale.

The facts of the case fully appear in the opinion of Haymond, President.

Hon. John Blair Hoge, Judge of said circuit court, presided at the trial below.

*Andrew Hunter* and *J. M. Mason* for appellant.

*Joseph Trapnell* for appellee.

HAYMOND, PRESIDENT:

Prior to 1870, Nathan S. White, administrator of Leonard Sadler, deceased, filed his bill in the circuit court of Jefferson county, against Francis W. Drew and

others, praying for the sale of the lands of said Drew, situate in the county of Jefferson, to satisfy debts secured by deeds of trust upon a part of said lands, and also judgment liens against said lands, which were alleged to belong to the estate of said decedent. Subsequently, and on the twenty-ninth day of October, 1867, such proceedings were had in said cause, that the cause was referred to a master commissioner ot the court, with instructions, among other things, to ascertain and report: " First. The several liens, whether by deed of trust, or judgment on, the real estate of the defendant, Drew; what amount, if any, is due upon each deed of trust; what payments have been made on account of the same, with the dates and priorities of the several liens upon each parcel of said real estate." Afterwards the master commissioner made and filed his report in the cause, in which he reported a number of deeds of trust and judgment liens existing against the lands of said Drew, due from him to sundry persons, among others, the plaintiff.

In the said decree of 1867, the court, by and with the consent of said Drew, decreed the sale of the following lands of said Drew, viz: one tract of sixty-six acres, one rood, and twenty-seven perches; one tract of twenty acres, and one tract of fourteen acres, one rood, and twenty-five perches, amounting in the whole to one hundred acres, three roods, and twelve perches, they being the parcels of land conveyed by deed of trust, of date June first, 1858, to Nathan S. White and Lawson Betts, by the said Drew and his wife, for the payment of debts. Isaac Fouke and Charles J. Faulkner were appointed commissioners to make said sale. Subsequently, said commissioners made their reports of sale under said decree, and the court afterwards, on the thirteenth day of June, 1873, among other things, decreed, in said cause, that Isaac Fouke, Joseph Trapnell, Thomas C. Green, and Charles J. Faulkner, who were appointed special commissioners for the purpose, should sell the tract, or parcel, of ninety-nine acres, adjacent to Charlestown, upon

which said Drew resided, to pay said liens not before paid, or provided for. Afterwards, the said special com- missioners made report to the court, that, among other things, they had offered said last named tract, or parcel, of land, for sale at public auction, in front of the court-house door of said county, upon the terms prescribed in said last named decree, said sale to be subject to survey ; that, at said sale, William H. Kable, being the highest bidder, said property was knocked down to him at the price of $115.25 per acre. They further reported to the court, that said tract of land, so sold by them, contained one hundred and one acres, two roods, and twenty perches, and consists of two parcels, the one known as the Douglass tract, containing ninety-nine acres, no roods, and five perches. The other, called the Morrow lot, containing two acres, two roods, and fifteen perches, as per survey and plat of S. H. Brown, Esqr. S. J. C. made a part of the report. Said special commissioners further reported, that said Kable, on the day of the date of said report, paid into the hands of the special commissioners, who qualified under said decree, the sum of $3,803.25, being one-third of the purchase-money for ninety-nine acres, (the quantity supposed to be contained in the said tract).

The commissioners further reported to the court, that they had received information that a motion to open the biddings would be made, and an advance of ten per cent. offered upon said land. This report is signed by all the commissioners, and is dated the twentieth day of October, 1873.

Afterwards, on the first day of November, 1873, and during the same term to which said special commissioners made their said report of sale, the motion made by the appellee, Charles J. Mitchell, to re-open the bids on the sale of said land, made by said special commissioners, under the last named decree of sale, upon a proposed advance by him of ten per cent. on the bid of the appellant (Kable) was heard on said report of said special

commissioners, filed at that term, and the affidavits of sundry persons filed. And the court, in its decree, made at the date last aforesaid, recites, substantially, that, it appearing that written notice to all the parties to the cause, as well as to said Kable (appellant), of said motion, had been given more than ten days before said motion was made. On consideration whereof, the court doth adjudge and order, that the biddings at said sale be re-opened, on said Mitchell paying to said special commissioners the amount of all costs and charges of making said sale, in which the sum of fifty dollars is to be included, for commission of said special commissioners, for their trouble in making said sale, that is to say, the sum of $85.25, and also the interest on the cash payment of Kable (appellant) of $3,803.25, from the twentieth day of October, 1873, when said payment was made to said special commissioners, to this day, that is, $6.97, and executing and filing with the papers of the cause, bond, with good security, approved by the court, payable to the State of West Virginia, in the penal sum of $6,000, conditioned that said Charles T. Mitchell, when said real estate of said Drew shall be again put up at public sale, in pursuance of a decree of this court, shall bid for the same the price heretofore bid for the same, together with said advance of ten per cent., that is to say, shall bid $126.77½ per acre for said land; and if no responsible bidder shall bid more than that, he, as purchaser, will take the same, and both, as to the cash payment, and all other terms of said sale, comply, in all respects, with the terms of said sale so to be made. And, thereupon, the said Mitchell paid to the said special commissioners the sum of $92.22, the amount of said costs, charges, and interest, and executed said bond, with Ella B. Washington, John J. Locke, and James L. Hooff, his securities, who were approved by the court, and filed the same among the papers of the cause. And the court doth order said special commissioners to repay, at once, to the said Kable the said sum of $3,803.25, the cash received

of him, and said sum of $6.97, the interest on the same to this day. And said report of said special commissioners, so far as the same shows that the said sum of $85.25, the costs and charges of said sale, and the said commissions allowed the said commissioners, have been paid, is hereby approved.

Immediately following this decree, the record discloses a writing in these words, viz: "I have this day purchased of Isaac Fouke, Joseph Trapnell, Thomas C. Green, and Charles J. Faulkner, special commissioners of the circuit court of Jefferson county, West Virginia, in the chancery cause pending in said court, in which N. S. White, administrator of Leonard Sadler, is plaintiff, and F. W. Drew and others, are defendants, at the public sale made this day, under the above advertisement, hereto appended, the farm on which Francis W. Drew, now resides, lying adjacent to, and partly within, the town of Charlestown, in said county, containing ninety-nine acres of land, or thereabouts, at the price of $115.25 per acre, the exact quantity to be hereafter ascertained by survey, on these terms to-wit: One third to be paid in cash, the residue in one and two years, in equal payments, with interest on the same from this day, to be secured by bonds and a deed of trust on the premises. And I hereby bind myself to comply with the said terms of sale, and I hereby agree to pay to said Isaac Fouke, Joseph Trapnell, Thomas C. Green, and Charles J. Faulkner, said commissioners aforesaid, or such of them as shall qualify, as prescribed by the decree in said cause, the sum of $3,803.25 in cash, and to execute my two bonds for the residue of the purchase money, to be paid in two payments, one in one year, and the other in two years from this date, with interest from said date, so soon as such residue is ascertained by special survey, and to secure the same by deed of trust on the premises. As witness my hand this, sixth day of August, 1873.

(Signed)      WM. H. KABLE."

Upon this writing, is this endorsement, viz: "We, the

special commissioners, within named, concur in the sale to Wm. H. Kable, for the price within stated. Given under our hands, this sixth day of August, 1873.

(Signed)                  ISAAC FOUKE,
                          JOSEPH TRAPNELL,
                          THOMAS C. GREEN,
                          CHARLES J. FAULKER."

The advertisement of sale made by the commissioners immediately follows said writing, signed by Kable, and it appears that it is the same advertisement referred to in said writing.

From the said decree of the first day of November, 1873, directing the biddings on said sale to be re-opened, the appellant has appealed to this Court.

The appeal was first applied for, and obtained by said Kable, from said decree from this Court, on the — day of July, 1874. It further appears by the record of the cause, first in this opinion mentioned, that, on the tenth day of November, 1873, the court, by its decree then rendered, decreed, that the said special commissioners, Fouke, Green, Trapnell, and Faulkner, should again offer for public sale before the front door of the court house, in Charlestown, Jefferson county, the tract of land on which the said "Drew resides, containing according to survey returned with said report of said special commissioners, one hundred and one acres, two roods, and twenty perches, including the Morrow lot, and that in making said sale, they shall put the same up at the bid of C. T. Mitchell, of $126.77½ per acre," &c. The record in this cause further discloses another writing among the papers of the cause of Sadler's administrator v. Francis W. Drew and others, which appears to have been inserted in the record of this cause by the direction of the counsel therein, and is as follows, to-wit: "The following facts are admitted: That the record in the case of *Sadler's adm'r v. Drew et al.*, shows:

1. That previous sales of the real estate of Drew,

made in said cause, will pay off the debts in classes one and two, of commissioners report.

2. That the debts in classes from number three to twelve, inclusive, amount to $8,502.86, of which $5,833.08 bears interest from June 1, 1868.

3. That the costs of said suit to October term, 1873, amount to $200.

4. That the expenses of the sale to Kable were $286.94. I remark here that this is clearly a mistake. The costs of the sale were in fact about what the court ascertained in its decree, as clearly appears from and by the record, to-wit: $85.25, which includes the cost of survey.

5. That the Sadler judgment (viz. class 13) is for $1,500, with interest thereon from February 18, 1860, and $7.05 costs.

6. That at the second sale, Mitchell bid $140 per acre for the land, and the sale to him was confirmed. (But it is understood that petitioner objects to this last fact, being considered by the court, on the ground that what occurred after the sale was set aside, is no part of the record for the hearing of this case.)

7. That part of the land sold, including the mansion house and part of the curtilege, lies within the corporate limits of Charlestown.

8. That the balance of debts audited by commissioners against Drew in the said case, in classes from fourteen to nineteen, inclusive, amount to $6,290.22, with interest on part thereof from June 1, 1868.

(Signed)      THOMAS C. GREEN;
(Counsel for Leonard Sadler's adm'r.)
J. M. MASON,
(Attorney for Kable.)"

It further appears that the sale of said land to Mitchell under the second decree of sale, at the price of $140 per acre, was made and reported and confirmed by the court prior to the thirtieth day of April, 1874. It further appears by the record in the case of *Sadler's Admr.*

*v. Drew, et. al.*, that on the thirtieth day of April, 1874 the court directed the said special commissioners to pay out to the creditors of said Sadler, deceased, in said decree specified, the cash payment received by them from Mitchell on the said land.

By consent of appellant and appellees, by their counsel, respectively, entered of record in this cause in this Court, it was agreed that their cause should be heard by this Court upon a paper writing marked *X. Y.* in the words following, viz: "Supreme Court of Appeals, Wm. H. Kable *v.* C. T. Mitchell." The following facts are admitted in addition to these embraced on page 24 of the printed record. 1. That no exception was taken or filed to the confirmation of the report of the sale to C. T. Mitchell; that his cash payment was made and the same by decree of the court, distributed amongst the creditors of F. W. Drew. 2. That the survey ascertaining the quantity of land to be 101 acres, 2 roods, 20 perches, was made prior to the twentieth of October, 1873. 3. That the $3,803.25 paid by Kable to the special commissioners, with its interest, has been refunded to him, and that the same was accepted, and received by him prior to the sale to Mitchell, and that 2 acres, 2 roods, 20 perches, were in the corporation of Charlestown.

. (Signed,)        CHAS. J. FAULKNER, for appellee.

. Admitted, subject to objection reserved on page 25 of record.                    J. M. MASON."

On pages 24 and 25 of printed record, are the facts admitted by the writing signed by counsel, first copied herein, which includes said reservation on page 25 aforesaid. Sundry affidavits appear in the record, in which the motion to open the biddings was heard. It appears that Kable filed the affidavits of S. H. Brown, Esrom Slifer, W. F. Lippitt, Charles T. Mitchell, Robert W. Baylor and Kable's own affidavit. Brown in his affidavit, says, substantially, that he has been surveying in Jefferson county for twenty-five years; that he has been

cognizant of the few sales of real estate in the vicinity of Charlestown in Jefferson county, which have taken place within the past year; he is familiar with the farm called the Drew place, near said town; that he was present at the sale of said property made on the sixth of August, 1873, and he regarded the sale as a sale at full price, and as much as the property was worth; that he did not expect the property to bring over $100 per acre; that he don't think the property would bring over the bid made by Kable on said day; that farming land in said county has been steadily declining for the past several years; that because of the facilities afforded by the building associations, building lots in the immediate vicinity of said town have sold at an enhanced price, being probably double the price they would have brought five years ago.

The affidavit of Slifer is in the form of a deposition, and he seems to have been examined in chief, and cross-examined, and it appears that he was asked on examination in chief: "Did you and John J. Locke enter into an agreement relative to the purchase by you of certain property from Locke, a short time before the sixth of August, 1873?" to which he made answer: "The day before the sale, as well as I recollect, he asked me what I would give him for the "Spirit" building, in case he, Locke, bought the Drew farm at sale; the morning of the sale, I told him I would give him $6,500; he said we were not far apart; he asked $7,000; it was understood that I would give him $6,500 if he made the said purchase, and I was to pay him cash sufficient to make the first payment on said land. Slifer was further asked: "Before the conversation referred to, did you express an opinion, and put its value at from sixty to seventy-five dollars per acre?" to which he answered, "I think I did express such an opinion, and put its value at from sixty to seventy-five dollars per acre." He (Slifer) was further asked: "Do you think the land sold for its full value? to which he answered: "I do; I had a claim

against Drew for $200, and thought the land would have to sell for $150 per acre in order to reach this claim, and did not advise Locke to go beyond $115 per acre, because I thought that was the full value of the land.

On cross-examination, Slifer was asked, "How far, in your conversation with Locke, did you advise him to bid that day?" And he answered, "I don't think I advised him all; I may have said to him to bid as high as you please, I would make the first payment." He was asked this question also : " Did not Thomas C. Green, one of the commissioners, during said sale, complain to you and find fault with you for freely expressing your opinion in the presence of bidders, that the property was not worth more than $60 or $75 per acre, and were you not so publicly expressing your opinion on said day of sale?" to which he made answer, "I may have expressed an opinion in public on the day of sale ; I have no doubt I did ; I had no axe to grind, for Mr. Locke said to me, if you will give $7,000 for the ' Spirit ' building, he (Locke) would go higher for the Drew property; Mr. Green did come to me, and complain that I was depreciating the property by speaking in this manner of it before bidders." Slifer also says further on, that he has resided within six miles of Charlestown for thirty-five years, and thinks he is acquainted with the value of land about Charlestown, and would not trade his opinion for any other man's, when he pays his own money for it.

W. F. Lippitt says he was present at the sale of the Drew place on the sixth of August, 1873 ; that he is well acquainted with the property, and that, in his opinion, it sold for its full value, and for more than it would bring.

Mitchell in his affidavit says, that he had desired to purchase the Drew place for four or five years ; that prior to the sixth of August, 1873, he went with a carpenter to examine the house ; that, at the sale, he bid $110 per acre; that during the bidding, Col. Baylor came to him and said that he (Baylor) had just come from among the crowd, and they were going to run the place up on

him; that on the day of sale, he thought the property was worth more than $115.25 per acre; he thinks now that the property was worth then $125, to $130 per acre; that he spent every summer in Charlestown, except two, since 1866; that he is not particularly acquainted with property in the vicinity of Charlestown; that he resides in South Carolina, and was never on the place, except when he went with the carpenter, aforesaid; that he has been in correspondence with George W. Sadler about the property for four or five years, and he considers that J. J. Locke and W. H. Kable were running the property up on him.

Baylor says, in his affidavit, that on the sixth of August, 1872, he was present during the sale; that Mr. Mitchell consulted him as to the value of the land, and he told him that the property was in very bad condition; the gable end of the house, had fallen in, the barn was a total wreck, and the land very much reduced, and without fencing; as a friend, he would not advise him (Mitchell) to give over $100 per acre. Mitchell told him that was his limit. He (Baylor) stated to him (Mitchell), that he ought to determine in his own mind, what he would give, as he (Baylor) believed the creditors might run the property up on him, if they believed he was over-anxious to buy; that during the sale, a note was handed him from Mrs. Washington, advising him to go as high as $110 per acre, that he (Mitchell) handed him the note to read, and, upon consultation, he advised Mitchell to bid the $110, as his family wished him to do so. Mitchell stated $110 was too much, and that he would not give it. That he (Baylor) has been a resident of the county for sixty years, and is well acquainted with the lands of the county, and their value, having assessed the lands of the county.

Kable, in his affidavit, says: that he was the last bidder at the sale of the Drew property, on the sixth of August, 1873; that the property sold for $15 per acre more than he expected, and that he purchased with

a view of moving his school there; that after the bidding was closed, finding the impression prevailed among well informed persons, that the property had sold at an over value, and thinking his credit might be affected by that impression, he was very careful to spread among his friends the fact, that he had predicated his bid upon an agreement with R. P. Chew, by which said Chew was to take part of the unimproved land, and that, after the bidding was closed, the impression prevailed in Charlestown, that the property had sold at a very high price.

Chew, in his affidavit, says he was present at said sale of the sixth of August, 1873; that Mitchell was a bidder at the sale, and stopped bidding while the land was being cried, at about $100. per acre; that after Mitchell stopped bidding, the bidding was confined to J. J. Locke, and W. H. Kable, until it reached $113. per acre, when at request of Kable, he, (Chew,) commenced bidding, and ran the property up against Locke, to $115, and then made a bid of $115.25, at which price, the property was knocked down to said Kable; that he, (Chew) and Kable had, prior to said sale, made an agreement to purchase the property, if it did not sell for over $100. per acre; that after the sale, he, (Chew,) believed that the property sold for its full value; that he was interested in said purchase, and was to take 40 acres unimproved at about $95. per acre, that he, (Chew,) regards the property as being sold at a "fancy price," the land being very much impoverished, and buildings and fencing in poor condition. Mitchell filed the affidavits of W. T. Kearsley, John J. Locke and Dr. G. F. Mason.

Kearsley states in his affidavit, that he has resided in Charlestown for many years, and is well acquainted with the farm on which said Drew resides, lying partly in the limits of the corporation of Charlestown, sold by the commissioners in this suit on the sixth of August, 1873; and that in his opinion, said land was worth at that time, $125. per acre, to a purchaser buying it as an invest-

ment, and $175. per acre, to a purchaser buying it for a home.

Locke, in his affidavit, says that he is well acquainted with the tract of land on which said Drew resides, lying partly within the corporation of Charlestown, purchased by said Kable of the Commissioners on the sixth of August, 1873; that he was a bidder at said sale, and his judgment is, that the property sold at less than its value, and that on a resale, it will, in his judgment, sell for more than ten per cent. more than the price it then sold for, that is, for more than $127. per acre. That he does not know of any particular person besides said Mitchell, who will give more than $127. per acre; that he would have given $125. per acre for the land on the day of said sale, if it had not been for an unfortunate arrangement he made that morning, whereby he, in order to put himself in a position to buy the land, agreed to sell certain property of his at what he thought a very small price, if he became the purchaser of the land ; and having made this arrangemement, he did not feel justified in bidding what he deemed the value of the property, because, by reason of this arrangement, his purchase of it involved what he deemed a sacrifice of his property. The property sold for more than what he had been led to suppose it would bring. Doctor Mason, in his affidavit, says that he has known said Drew property, lately sold by commissioners of court to said Kable, for at least thirty years, and considers, at the time of making the affidavit, also, at the time of the sale, it was and is worth at least $125. per acre; that is, is worth that as an investment as a home for gentleman of means, and that said property is worth in his opinion, $150. per acre.

It appears by the record, that it was agreed by J. M. Mason, counsel for Kable, and T. C. Green, counsel for C. T. Mitchell, that the following statement of N. S. White, should be read as evidence without being sworn to, the said statement being filed by Kable, with the affidavits herein before referred to—said statement is as

64

follows, viz : " That since the property of F. W. Drew was sold by commissioners, Faulkner, Green and others, in August last, to W. H. Kable, two of the sons of Leonard Sadler—one of them representing the third brother, authorized affiant, as administrator of L. Sadler, to dispose of a judgment in favor of their father's estate, against F. W. Drew, to Charles T. Mitchell, on terms contained in writing, as follows : To N. S. White, admr. of L. Sadler :

Should Mr. Charles T. Mitchell, of Charleston, S. C., open the biddings on the land of F. W. Drew, lately sold by commissioners of court, to Wm. II. Kable, in suit of Saddler's adm'r v. Drew and others, by an advanced bid, and become the purchaser of the property at that or any other bid above that, you are authorized and empowered to transfer to him so much of the judgment for fifteen hundred dollars, with interest standing in class 13, in the commissioners report, at the price of fifty cents, as would not be covered by the sale lately made to said W. H. Kable. Given under our hands this twenty-fifth day of September, 1873.

(Signed)                    G. W. SADDLER,
                            L. L. SADDLER,
                            J. N. SADDLER,
                    (per G. W. SADDLER.)

This paper was shown to Mr. Charles T. Mitchell, and the purport of the same explained to him. He said he intended to open the biddings.

(Signed)                    N. S. WHITE,
                    Adm'r of L. Saddler."

Under the foregoing statement of this case, it now remains for this Court to determine whether there is error in the decree, setting aside the said sale made to Kable, such as will justify this Court in reversing the same.

The appellant, (Kable,) in his petition for appeal to this Court, assigns as error, " the order setting aside the sale to him, and says he is advised that the former Eng-

lish practice of opening the bids because of an advance of ten per cent. offered to the court is unknown to the courts of this State; but a sale fairly conducted by the commissioners, will be confirmed, if the land has been sold under favorable circumstances, and in the manner most likely to have obtained the highest price possible." It is argued, however, by the counsel for appellees, that Kable, the appellant, is not so far a party to the original suit, as to entitle him to appeal under our statute upon that subject. I deem it proper to consider this question first.

By reference to the seventeenth chapter of the Acts of the Legislature of 1872 and 1873, page 56, section 1, it is provided that a party to a controversy in any circuit court, may obtain an appeal, writ of error, or *supersedeas*, to the Supreme Court of Appeals, from a judgment, decree or order therein, in the following cases, &c.:

It is contended that the words "party to a controversy," as employed in the statute, means a party to the original suit, and that a purchaser at a sale made by a commissioner appointed by the circuit court, by its decree made in a cause between other persons pending in the court, is not a party to the "controversy." I am not aware that this question has ever been determined in this State, but the question has arisen elsewhere and been decided. In the case of *Blossom v. The Milwaukee, &c., Railroad Company*, 1 Wallace, Supreme Court U. S. R., page 655, it was held according to the *syllabus* that "A bidder at a marshall's sale, made on foreclosure of a mortgage in a federal court below, may, by his bid, though no party to the suit originally, so far be made a party to the proceedings, in that court as to be entitled to an appeal here. Whether or not this court will not dismiss an appeal by such person, on mere *motion* of the other side, the decision involving the merits of the case, and such an examination of the whole record as can only be made on full hearing."

It is unquestionably true that the purchaser at said

sale cannot appeal from the decree directing the sale, nor from any other order or decree of the court made in the cause prior to his bid. In the case just cited, Justice Miller who delivered the opinion of the court, says: "A purchaser or bidder at a master's sale in chancery subjects himself *quoad hoc* to the jurisdiction of the court, and can be compelled to perform his agreement specifically. It would seem that he must acquire a corresponding right to appear and claim, at the hands of the court, such relief as the rules of equity proceedings entitle him to." Again he says: "It however, seems to be well settled, that after a decree adjudicating certain rights between the parties to a suit, other persons having no previous interest in the litigation, may become connected with the case in the course of the subsequent proceedings, in such a manner as to subject them to the jurisdiction of the court, and render them liable to its orders, and that they may, in like manner, acquire rights in regard to the subject matter of the litigation, which the court is bound to protect."

In the case of *Delaplaine v. Lawrence*, 10th Paige's R. 602, Chancellor Walworth says, that "in sales made by masters under decrees and orders of this court, the purchasers who have bid off the property, and paid their deposits in good faith are considered as having inchoate rights which entitle them to a hearing upon the question whether the sales shall be set aside. And if the court errs by setting aside the sale improperly, they have the right to carry the question by appeal to a higher tribunal." *Talley et al v. Starke's Admr. et als*, 6 Gratt. 339; *Roberts v. Roberts*, 13 Gratt. 639. This principle seems to be reasonable and I see no objection to it, and I think it applies here. I therefore am of opinion, that Kable, by his bid at said sale, and the payment of the cash payment to the commissioner in obedience to the decree of sale, did, thereby, become so far a party to the "controversy" within the meaning of the statute of this State upon that subject, as to entitle him to an appeal to this Court, if

granted by the proper authority from said decree setting aside the sale made to him by said special commissioners.

I will now proceed to consider the errors assigned by the appellant's counsel. But, in this connection, and as having some bearing on the question, it is proper to say, that there is a very wide difference in the opinion of the persons whose affidavits were taken as to the value of the land at the time of the sale. As has been seen, some of those, whose affidavits have been taken, place the value of the land as high as $175 per acre; in fact, the affidavit filed by Mitchell, fix the value of the land, at the time of the sale, at from $125 to $175 per acre. Then, again, the affidavits filed by the appellant, fix the value at much less, and state that the land was well sold in the opinion of the affiants. A small plurality of the affidavits seem favorable to the land having been struck down to appellant at a fair price, and it is probable if there was no other evidence or facts in the cause, relevant and proper to consider, it would have to be determined that there was a preponderance of the evidence, that the price bid by Kable, to-wit: the $115.25 was a fair price for the land. But the most that can be said of these affidavits is, that they express opinions only. Locke says in his affidavit, that the property was sold to Kable at less than its value, and that he would have given $125 per acre for the property, but for an unfortunate arrangement he made the morning of the sale, which is explained in his affidavit and that of Slifer. Mitchell, in his affidavit, says that he is not particularly acquainted with property in the vicinity of Charlestown; that he resides in South Carolina; that he was never on the place except when he went with a carpenter to examine the house. In my judgment, the court, in considering whether the sale of the land to appellant ought to be set aside, was not confined simply, to said affidavits, but that there are other facts material, if not conclusive, upon the question which it was proper to consider. These facts will hereafter be

referred to. I deem it proper to ascertain and determine, at this point, what principle or rules have governed the courts of equity in Virginia in relation to setting aside or confirming sales made by commissioners of said courts under decrees of sale touching the prices bid at those sales.

Kent in his commentaries at side page four hundred and twenty-nine, under the head *"of title by execution,"* says "This species of title owes its introduction to modern statutes, and it was unknown to the common law. The remedy given to the judgment creditor by the English law, was a sequestration of the profits of the land by writ of *levari facias,* or the possession of a moiety of the lands by the writ of *elegit,* and, in certain cases, of the whole of it, by *extent.* In all these cases, the creditor holds the land in trust until the debt is discharged by the receipt of the rents and profits.

This limited remedy against the real estate of the debtor, was not deemed sufficient security to British merchants, in its application to the American colonies; and the stat. of 5 Geo. 11, c. 7, was passed, in the year 1732, for their relief. It made lands, hereditaments, and real estate, within the English colonies, chargeable with debts, and subject to the like process of execution on personal estate. Lands were dealt with on execution precisely as personal estate." According to Kent in fourth Vol., on pages (side) 430, 431, 432, 433, 434, the most of the States still sell land, under execution, as personal property is levied on and sold, and the sheriff executes a deed to the purchasers, which, by relation, vested the defendants title in the purchaser from the time of sale. The deed connected with the sale, operated by way of execution of a statute power to pass the defendant's title. But in most, if not all said States, they have appraisement laws and further statutory provisions, giving the debtor, whose land is sold under execution, from six months to a year, or more, to redeem the land. But at side page 434, of 4 Kent, Judge Kent says, Virginia

is an exception to the general practice of selling land on execution. At side page 431, he further says, "But sales of land on execution, had been attended with so much oppressive speculation upon the necessities of the debtor, that the legislature of New York, a few years past, provided some powerful, but not unreasonable, checks, upon the peremptory and sweeping desolation of an execution at law," &c.

The counsel for the appellant, in support of the assignment of error, cited the case of *Stump v. Martin*, 9 Bush. (Kentucky) 285. In this case, Judge Pryor delivered the opinion of the court, and, on page 289, he says "The practice in the English courts of chancery is to open the biddings, and order a re-sale, whenever an advance of ten per cent is offered with an indemnity to the purchaser by paying him his costs incurred by reason of his bidding, &c. In this State, this rule has never been sanctioned by this Court; but, on the contrary, such sales will not be disturbed for mere inadequacy of price, unless there has been such a sacrifice of property as to import fraud. There must be either fraud or misconduct, in some way, connected with the sale; some surprise or misapprehension on the part of those interested, or of the officer who conducts the sale, or some irregularity in the proceedings, or other circumstances attending it, conducing to show unfairness, before the chancellor will refuse to confirm this act of his commissioner." For the purpose of showing that mere inadequacy of price is insufficient, Judge Pryor says at pages 290, 291, "In *Forman & Dana v. Hunt* (3 Dana, 621) the land sold for one tenth of its value; in *Busey v. Hardin* (2 B. Mon. 411) it sold for about one-twelfth its value; in *Dale v. Shirley* (5 B. Monroe) two hundred acres of land sold for $137; in *Egard v. Chearnly* (1 Bush) the land sold for $1,000, and the subsequent offer was three thousand dollars. In all these cases, although the great inadequacy of price constituted the principal objection to confirming the sales, still this court has been careful to look to other

facts in connection with this great sacrifice of property, in order to relieve the debtors by setting aside the sale, and mere inadequacy of price was held insufficient for that purpose."

On further, on page 293, the Judge says: "If the property had been sold under an ordinary execution for two-thirds of its value, the absolute title would have passed to the purchaser; and still no such sacrifice is pretended to have been made in this case." From this I infer that land is still liable to be levied on, and sold, as personal property in Kentucky, and that it cannot be sold, ordinarily, for debt, for a less price than two-thirds of its assessed value. As we have seen in Virginia, for many years past, lands could not be sold, ordinarily, under a writ of execution, and cannot be in this State. Appellant's counsel also cites *Millican v. Vanderplank,* 11 Hare, 145; *Vanbussum v. Maloney,* 2 Met. (Ky.) 552; *Bolgiano v. Cooke,* 19 Md. 375; *Kauffman v. Walker,* 9 Md. 229; *Savile v. Savile,* 1 P. W., and other authorities. Counsel for appellant claim that the principle decided in the case in 9 Bush. has always been the Virginia and American view of the subject, and in support of this view, he refers to a case of *Ross v. Taylor,* in U. S. Circuit Court of Virginia, which was never reported, and he professes to quote largely from what he claims to be the opinion of Judge Marshall, delivered in that case, and, among other sentences, the following, viz: "The doctrine of opening the biddings, is not, in itself a principle of equity; but a practice established by particular courts, in consequence of a principle, which practice enters into the contract, and forms its character. In consequence of that practice the contract is, in fact, on both sides, conditional, until the report of the master is affirmed:

But in Virginia, in pursuing the same principle, the courts have established a different practice. In Virginia, the contract is absolute. The purchaser is entitled to his purchase, and cannot recede from it. The benefit, or loss, is legally his, and it requires some impropriety which

vitiates the transaction, to set it aside. I will not deny that, in my opinion, the usage of the English courts is to be preferred; but if I could introduce it, the rule should be prospective, and not to affect past transactions," &c· Whether this opinion was ever delivered by Judge Marshall, I am unable to say, but whether it was, or not, the proper places to look for what has been, and is, the practice, or rule in courts of equity in Virginia, and this State, is in the decisions of the highest appellate courts of said States. In the case of *Taylor v. Cooper*, 10 Leigh 317, Judge Tucker, in delivering the unanimous opinion of the court, says: "The principles of the court, according to the English practice, I take to be these :

1876.
August Term.

Kable
v.
Mitchell.

" 1. Where there is a sale by the master, and where the property appreciates by the accidental falling of lives, or by other means, the court will only confirm the sale upon the terms of the purchaser's making compensation. *Davy v. Barber*, 2 Atk. 490 ; *Blount v. Blount.* 3 Atk. 638. And in doing this, it but acts within the scope of its rights and powers; for the sale is not conclusive until confirmed, and justice to the owner of the estate, demands, that when there has been a material appreciation before confirmation, a resale should be directed, unless the purchaser will make compensation.

" 2. Where, after the sale, and before confirmation, (as in the cases of *Ex parte* Minor, 11 Ves. 559, and *Heywood v. Covington's Heirs*, 4 Leigh. 373), the property is destroyed, or materially injured, by flood, or fire, the loss must fall on the vendor; for, as in the case of appreciation, the vendee will be charged with compensation, so, in the case of depreciation by destruction of part of the estate, he has a fair claim to deduction. Until the sale is confirmed, he is considered, in *England*, as having no fixed interest in the subject of purchase. 11 Ves. 559. Before it is confirmed, he is always liable, there, to have the biddings opened, and, therefore, *non constat* that he is a purchaser. Anonymous, 2 Ves. Jun. 336. In case of loss, he is, therefore, allowed a deduction. The prac-

tice with us has gradually departed from that of the English courts, in some respects, which it is not necessary here to set forth.

" 3. But, *thirdly,* where the sale is confirmed, that is, where both contracting parties (the purchaser and the court) concur in ratifying the inchoate purchase, the confirmation relates back to the sale, and the purchaser is entitled to everything he would have been entitled to, if the confirmation, and conveyance of title had been contemporaneous with the sale. *Anson v. Towgood,* 1 Jac. and Walk. 647. In this manner, I think, the several authorities are easily reconciled; and if this be so in England, I think it may be safely affirmed to be yet more unquestionable under our practice."

So far as I am advised, it has never been the rule or practice of courts of equity of Virginia, or of this State, in decreeing the sale of lands, and appointing commissioners to make the sale, to direct and empower the commissioners to both sell and convey. The decrees universally direct the commissioners to sell, and report their proceedings to the court, and the court, upon the report of sale, either approves and confirms the sale, or sets it aside. But on one occasion, in the case of *Evans and wife v. Spurgin,* 6 Gratt. 107, commissioners appointed in 1807, to sell land to satisfy a debt which was a lien thereon, sold the land the same year, and conveyed it to the purchaser; and they collected the purchase money and paid it to the plaintiff in part discharge of the debt, but did not report their proceedings to the court until 1835, and in 1836, the court confirmed the sale, and ratified and confirmed the deed. Afterwards the devisee of the purchaser at the sale, brought a writ of right to recover the land, and the court held, in that action, that the confirmation gave full effect and validity to said deed, and related back to the time of its date, so as to invest the purchaser with the legal title of the original owner to the land. In this case, Judge Allen, in delivering the opinion of the court, says: "Yet as commissioners, ap-

pointed by the chancery court to make sale of property,

act subject to the supervision and control of the court, their acts, when sanctioned and approved by the court, become the acts of the court." In the case of *Cocke's Adm'r v. Gilpin*, 1 Robinson, (Va.) R. 39. Judge Baldwin in delivering the opinion of the court, says: "In truth, however, the purchaser acquires no right until a confirmation of the sale by the court, and until the order confirming the report, he is only *inchoately*, and *not absolutely*, a purchaser, having till then no *fixed* interest in the subject. That such is the English dotrine is well settled ; Sugd. on Vend. 50, 51, 52, 57, Ex parte Minor 11, Ves. 559, *Swigg v. Fifield*, 13 Id. 517, *Anson v. Towgood*, 1 Jac. and Walk. 619. The same doctrine has been recognized by this Court in several cases, *Crews v. Pendleton, &c.*, 1 Leigh. 297. *Heywood v. Covington's Heirs*, 4 Id. 373. *Taylor v. Cooper*, 10 Id. 317."

In the case of *Effinger v. Ralston, et. al.*, 21 Gratt. 430, it is stated in the second division of the syllabus, that it was held. "If E objected to the sale for inadequacy of price, he should have moved the court re-open the biddings, and offered an advance on the price bid. His objection to the confirmation of the sale, without more, was no good ground for refusing to confirm it."

In this case, on pages 436 and 437, Judge Moncure, delivered the opinion the Court, says: "He made no motion to open the biddings. If he had done so, and pursued the proper course in such cases, the Court would have ordered them to be opened on proper terms." When a person is desirous of opening a bidding, (says Sugden in his law of vendors, p. 66, marginal), he must, at his own expense, apply to the Court by motion for that purpose, stating the advance offered. Notice of the motion must be given to the person reported the purchaser of the lot, and to the parties in the cause. If the Court approve of the sum offered, the application will be granted," and a new sale ordered. "Mere advance of price, (says Sugden further, *Idem,*) if the report

of the purchaser being the best bidder is not absolutely confirmed, is sufficient to open the biddings;" "but the Court will stipulate for the price, and not permit the biddings to be opened upon a small advance; and although an advance of ten per cent. used, generally, to be considered sufficient on a large sum, yet no such rule now prevails; but in the case of a sale under a creditor's suit, the Court permitted the biddings to be opened upon an advance of 5 per cent. on 10.000 pounds. An advance of 350 pounds upon 5,300 pounds was refused, and it was said that the former cases only established, that where an advance as large as 500 pounds is offered, the Court will act upon it, though it be less than ten per cent." "The determinations on this subject assume a very different aspect, when the report is absolutely confirmed. Biddings are, in general, not to be opened after confirmation of the report; increase of price alone, is not sufficient, however large, although it is a strong auxiliary argument where there are other grounds." (*Idem* 67.) Where the biddings are opened, the advance is ordered to be deposited immediately, and the costs of the purchaser to be paid by the person opening the biddings. (*Idem* 69.)

Such are some of the rules of the English practice on this subject, and the same practice and rules substantially exist in this State, though not in all the states of Union. They do not, however, apply to this case, as it was not a case for opening the biddings; no advance of price having been offered, nor even a motion to open the biddings made."

In the case last cited, the Judge says, "The commissioner who made the sale, reported that it was for a fair and full price, and ought to be confirmed; and many affidavits were taken and filed to that effect; while on the other hand, about as many were taken and filed to the contrary effect. The preponderance of the evidence seems to sustain the report, and the opinion of the court was to the same effect. To induce a court to set aside a

sale fairly made in pursuance of a decree, merely, upon the ground in inadequacy of price, there ought to be a decided preponderance of evidence of such inadequacy, even if it be conceded that mere inadequacy of price is, in itself, a sufficient ground for setting aside such sale."

It is proper here, to remark, that the commissioners, who made the sale in this case, did not report to the court that the sale was made for a fair and full price, and ought to be confirmed, but at the close of the report, they say they have received information that an advance bid of ten per cent. will be made upon the land. In the case of *Teel, et als. v. Yancey, et als.*, 23 Gratt. 691, it was held, according to the *syllabus*, that where a judicial sale of land is excepted to. 1. Because the land was sacrificed. 2. Because one of the commissioners was interested in the purchase of one-half of the land. 3. Because a material advance was offered by a substantial bidder. 4. Because there was no memorandum. These are valid objections, and the sale was properly set aside." It the case of *Sinnett et al. v. Cralle's, admr. et al.*, 4 West Va. R., 600, it was held that a sale of land made by commissioners under a decree of court, for the payment of judgment, which was a lien thereon, should be set aside for great inadequacy of price.

I think it is clear from the authorities I have cited, that a sale by commissioners, made under a decree of a court of equity, is not an absolute sale, in Virginia or in this State, and that it does not become absolute until the sale is confirmed by the court; that the court may, in the exercise of a sound discretion, either affirm or set aside the sale, or direct the biddings to be reopened, where from the facts and evidence and circumstances before it, it appears clearly, that the sale was made at a greatly inadequate price; that the court may solve and determine this question upon affidavits, or depositions in connection with the fact that, a greatly larger price is offered to the court, for the land, and secured, or offered to be secured, as was done in this case by Mitchell, who made

the offering, or it may do it upon any evidence, or fact, or facts before it, which clearly shows that the land sold' at a greatly less price than it was worth.

There can be no inflexible rule established, and no such rule exists with us, fixing any specific amount of per cent. required to be offered in advance of the last bid made at the sale, to justify or authorize the court to set aside the sale ; the amount of per cent. that should' be required must to a very great extent depend upon the amount bid at the sale. Each case should be determined according to its merits. For if a tract of land is sold for $10,000, an offer of ten per cent. made to the court, might be said to be an offer of a large advance in amount upon the price ; which if the land sold for $100, an offer of ten per cent. could not properly be so considered. It seems to me that the offering to the court of a large amount, in advance of the price bid to be secured, either by the payment of the amount offered in court, or giving bond and security, as was done by Mitchell in this case, is generally the very best evidence of the great inadequacy of price bid at the sale. In the case at bar there was conflicting evidence filed as to whether the land sold for its value or for greatly less than its value ; but when Mitchell came before the court, and offered an advance of ten per cent. upon the price, which was over $11,000, the court must at once have seen that the advance offered was an increase of $11.52½ per acre, and over $1,100 in the aggregate; and that the sale made by the commissioners at $115.25 per acre, was a greatly inadequate price, whatever doubts there may have been upon the subject in the mind of the court from the affidavits and other facts in the cause.

In such case it would be unjust to the creditors and oppressive upon the debtor, not to set aside the sale. It seems to me, upon principle, that the price bid by Kable at the sale, must be considered as his offer to the court, made through its commissioners, and by which he agrees to be bound, if it is accepted and approved by the

court; that it is discretionary with the court whether it will

accept the bid and confirm the sale, or set it aside. The discretion of the court, however, is not an arbitrary one; it should be correctly exercised, and is liable to review by an appellate court in a proper case. The discretion which the court may exercise, in such cases, will not authorize it to set aside the sale in the absence of sufficient cause.

Upon the whole, it seems to me there was sufficient cause for setting aside the sale made in this case. The bidder at the sale, it is true, may infer that if he is the highest and best bidder, and complies with the terms of sale, that the property is his; but still he is required to know that the court may, in the exercise of a sound discretion, approve or reject his bid for any sufficient cause, among others, that the price is greatly inadequate. The case cited in 4 West Virginia, was decided upon the weight of conflicting affidavits, the Court being of opinion from the weight of the evidence, that the sale was for a greatly inadequate price, and the case was decided by the Supreme Court of this State, in 1871. It seems to me that it is necessary for the protection of the creditor and the oppressed debtor each, that the court should have and exercise a sound discretion in approving or setting aside sales of land made by its commissioners for cause such as greatly inadequate price, &c., especially when it is remembered that the sale is forced. It is equally necessary in the case of infants, insane persons, &c., and, in such cases, where the court below has disapproved a bid, or set aside such sale, this Court should not disturb or reverse the action of the court below, unless it plainly appears that the court erred to the prejudice of the appellant.

As before stated, at the second sale of said land, Mitchell became the purchaser at $140. per acre, and the sale was confirmed. It further appears that, after the court set aside the sale to Kable, and before the land was sold by the commissioners to Mitchell at the second

sale, the commissioners, as directed by the decree setting aside the sale to Kable, paid to him the full amount of the cash payment made by him to the commissioners upon his purchase, together with its interest, and that Kable accepted and received it. And it further appears that after the sale made to Mitchell, and the confirmation thereof by the court, and the distribution of the down payment made by Mitchell on his purchase of the land, Kable, the appellant, applied for and obtained this appeal. It does not appear that Kable objected to the decree directing the re-sale of the land, or accepted, or objected to the confirmation of the sale made to Mitchell. Thus it appears that said Kable accepted and received the money which he paid on the land, with its interest from the commissioners who paid it to him, as directed by the decree setting aside the sale. He has received the purchase money paid by him, and by this appeal seeks the land.

In Powell, on appellate jurisdiction p. 178, under the head of *errors waived*, it is said : " Errors may be obviated by their being waived by the acts of the parties. In general, an error may be said to be cured or aided by the party doing something that relieves it of its objection ; but it is said to be waived when the party does some act inconsistent with his taking advantage of it. At page 181 of same book, it is said : " Errors may be avoided or cured by an estoppel; which is an act by which a person is estopped or precluded from either denying, or insisting upon, a matter which is inconsistent or repugnant to his former act, which it is said, may be by the record, or by deed, or matter *in pais*." It seems to me that the procuring of this appeal by Kable, from the decree setting aside the sale made to him, is clearly inconsistent with his act in accepting and receiving from the commissioners, the cash payment with its interest, which he paid to them on the sale to him, and also, that the receiving of said cash payment and interest from the said commissioners, is inconsistent with Kable taking ad-

vantage of error in the Court, in setting aside the sale to him, and that, by so doing, he may be properly and justly held by this Court to have waived such error, if any such existed.    But under the view of the case I have taken, this question is immaterial and not necessary to be settled in this case.    I therefore do not now definitely determine it, but leave the principle involved in the question open for future consideration, review and adjudication in a proper case.

For the foregoing reasons, the decree appealed from in this Court, must be affirmed with costs, and $30. damages to the appellees.

Judges Moore and Edmiston, concurred.

DECREE AFFIRMED.