# CHARLESTOWN.

HAYMOND, TRUSTEE, *v.* CAMDEN *et al.*

Submitted June 13, 1883—Decided September 29, 1883.

1. A non-resident party, against whom a decree has been rendered upon order of publication, having appeared and filed his answer in the circuit court, stating therein grounds of error, and praying the court to set aside the proceedings had against him on account of said error, which the court upon the hearing of the cause refused to do, may appeal to this Court from the decree so refusing to correct such error, without having first filed a formal petition for a rehearing of the cause, and giving bond for the costs as required by the statute ; there having been no objection made in the circuit court to his filing his answer, or the want of such formal petition and security for costs, it is too late to object for the want of such petition and security for costs for the first time in the Appellate Court. (p. 187.)

2. The late civil war between the United States and the Confederate States was accompanied by the general incidents of a war between independent nations, and the inhabitants of the United States on the one hand, and of the Confederate States on the other, became thereby reciprocally enemies of each other, liable to be so treated without reference to their individual dispositions or opinions, and during its continuance all commercial intercourse and correspondence between them were interdicted by principles of public law as well as by express enactments of Congress, and all contracts previously made between them were suspended, and the courts of each belligerent were closed to the citizens of the other. (p. 189.)

3. The right of the creditor to sue and collect his debt cannot exist unless at the same time a corresponding duty exists on the part of the debtor to pay—the right of the one and the duty of the other are correlative—consequently, where the duty of the debtor to pay is suspended by war, the corresponding right of the creditor to sue and enforce the collection of his debt cannot exist. (p. 190.)

4. Where during the late war a debtor resided within the Confederate and his creditor within the loyal States, the right of the creditor to sue being suspended, he could not lawfully sue his debtor during the pendency of the war. A suit instituted by such creditor, during said war, to enforce the payment of his debt by attachment against such debtor's property, or to enforce a vendor's lien, is without legal sanction or authority and all proceedings had therein are void. (p. 190.)

5. Jurisdiction is indispensable to the validity of all judicial proceedings. Jurisdiction of the person as well as of the subject-matter are pre-requisites and must exist before a court can render a valid judgment or decree, and if either of these is wanting all the proceedings are void. (p. 191.)

6. The notice by publication against a non-resident defendant, prescribed by the statute, is in the nature of a substituted service of process and must be duly published before the court can acquire full jurisdiction to make any order or decree affecting the defendant or disposing of the attached property. As to persons who can not legally see or obey it, such publication is without any effect or validity whatever. (p. 193.)

7. Judicial proceedings, during the late war, taken within the Union lines against defendants, who were absent in the Confederate lines, and who did not appear or have any notice thereof, except the publication of a notice to them in a newspaper which they could not lawfully see, are absolutely void. And it is immaterial in such case whether such defendants were permanent residents of the disloyal States or left their homes in the loyal States and went and voluntarily remained there during the war. (p. 193.)

8. In a civil war all the people on either side are at the commencement of hostilities citizens of the same common nation or country, and their subsequent status as enemies of each other is determined entirely by their residence in the territory of the one or the other belligerent. In which ever section such citizen elects to reside, he remains a citizen of that section and by public law he thereby becomes an enemy of the residents of the other section, and in neither section can he become by residence, individual opinions or sympathies an alien enemy of the section in which he resides. Therefore, while in a war between independent nations an *alien* enemy, *resident* in the country may sue and be

sued as in time of peace, such can not be the case in a civil war, because in such war former citizens of the one section by becoming residents of the other do not thereby become alien enemies. (p. 202.)

9. A sentence of a court, pronounced against a party without hearing him, or giving him an opportunity to be heard, is not a judicial determination of his rights, and is not entitled to respect in any other tribunal. (p. 198.)

10. The act passed February 10, 1862, by the General Assembly of the re-organized government of Virginia at Wheeling, so far as it attempts to confer jurisdiction upon courts in the loyal counties of the State, by order of publication against persons who left such loyal counties and went into the Confederate lines during the war, is invalid. (p. 203.)

11. In an attachment proceeding the jurisdiction acquired by the seizure of the property attached, is not to pass absolutely upon the rights of the parties, but to pass upon those rights after opportunity has been afforded its owner to appear and be heard. To this end the notice by publication prescribed by the statute is indispensable. Any decree, pronounced in such case without such publication and opportunity to the defendant to appear and make defence, is not a judicial sentence, and will be deemed *ex directo in rem.*, and collaterally void. (p. 204.)

12. Where a decree and sale thereunder are declared void for the want of jurisdiction in the court, the owner of the land so sold, by appearing in the cause and filing his answer, asserting the invalidity of said sale. but praying that the court may ascertain the balance of the debt due from him to the plaintiff, thereby becomes a party to the suit and waives the want of jurisdiction as to all the proceedings had in the cause not objected to and asked to be set aside in his answer. (p. 206.)

13. A purchaser of land, sold under a decree of court, becomes a party to the suit from the time of his purchase, and subjects himself to the orders of the court in all subsequent proceedings. (p. 207.)

14. A purchaser having purchased land under a void decree, is entitled upon the disaffirmance of the sale to be substituted to the rights of the creditor, and charge the land with the amount of the debt paid by him. (p. 207.)

15. The rents and profits, less the taxes, received by the purchaser whilst in possession of the land, should be deducted from the amount for which he is entitled to charge it, and he should have a decree charging the land for the balance. (p. 207.)

SNYDER, JUDGE, furnishes the following statement of the case :

In 1859, Luther Haymond, trustee, sold to R. Snowden Andrews eight hundred and nineteen acres of land located in Harrison county, at the price of fifteen thousand one hundred and fifty-one dollars and fifty cents, a part of which Andrews paid in cash and for the residue gave his bonds with G. D. Camden as surety; and thereupon Haymond conveyed said land to Andrews by deed retaining a lien therein for the payment of said bonds. A large part of said bonds remaining unpaid, but only a small part being then due, Haymond, in February, 1863, exhibited his bill in the circuit court of Harrison county against said Andrews, Camden and others for the purpose of enforcing the payment of said purchase bonds. On affidavit of the plaintiff, stating that by the laws of this State both Andrews and Camden were non-residents, an attachment was sued out and levied on the said land and other real and personal estate of the defendants Andrews and Camden. Neither of said defendants appearing a personal decree was, on December 12, 1863, entered against them and a sale of said eight hundred and nineteen acres of land directed, reserving the right to proceed against the property of Camden if said sale should not satisfy the plaintiff's debt and costs. The sale having been made, on March 12, 1864, to one James Lynch, the same was reported and confirmed by a decree of the court entered March 26, 1864, and the proceeds thereof ordered to be collected and paid to the plaintiff. The said sale failed to produce a sum sufficient to pay the plaintiff's debt, but left a considerable balance still due on the bonds of Andrews and Camden.

In June, 1870, Camden appeared and filed his answer in which he states that from April, 1861, to the close of the war between the United States and the Confederate States, he was a resident of that portion of the State of Virginia which by the proclamation of the President of the United States of July 13, 1861, was declared to be in insurrection against the government of the United States, and that he was in fact within the military lines of the Confederate States during the whole of said war and he believes his co-defendant, Andrews, was also an inhabitant, during the said war, of said insurrectionary portion of Virginia; that upon these

facts he insists the court could acquire no jurisdiction over him by order of publication, and that said decree of December 12, 1863, and March 26, 1864, should be set aside. On January 24, 1874, Camden tendered a formal petition for a re-hearing of said decrees for the same reasons set out in his answer, which petition the court rejected and it also refused to set aside said decrees. The court then, by its decree of that date, having ascertained that, after applying the proceeds of the sale of said eight hundred and nineteen acres of land, there was still due to the plaintiff two thousand eight hundred and ninety-six dollars with interest from January 23, 1874, directed the sale of so much of the real estate attached of Camden as might be required to pay the balance of said debt. From this and the previous decrees Camden promptly appealed, and this Court by its decree of November 2, 1876, reversed said decree of January 24, 1874, for reasons stated in its opinion reported in 9 W. Va. 680, to which reference is here made for a more full and detailed statement of the facts appearing in the case at that time.

In that opinion it was declared and decided that each of said decrees of December 12, 1863, and March 26, 1864, ordering and confirming the sale of said eight hundred and nineteen acres of land, was interlocutory, and that "neither of them was final either as to Andrews or Camden." In considering the errors assigned on that appeal the court in its opinion states that two of the errors complained of in said decree of December 12, 1863, are "based on the supposition that there was proof in the cause establishing that the plaintiff and defendants, Andrews and Camden resided, when this suit was brought, in hostile counties. But there is no such proof in this cause which this Court can consider. * * * * If the evidence, which this Court could consider, had shown that the circuit court of Harrison had no jurisdiction to render any decree against Andrews and Camden, because they had not properly been brought within the jurisdiction of that court, by the order of publication, this would have been a fatal error in the decree of December 12, 1863, and all subsequent interlocutory orders. It would have rendered those decrees entirely void, and must have been followed by this Court setting aside the sale of the land of

Andrews, made under a void decree.  *  *  *  *  It would
be improper for me to express any opinion as to what effect
the residence of the defendants in a hostile country, would
have had on the question whether the circuit court of Harri-
son had jurisdiction to render such decree in this cause.
This record presents no such case." 9 W. Va. 690–91. And
at the conclusion of said opinion it is stated, that: "To
avoid misapprehension we desire it understood that if it shall
hereafter appear, that, in point of fact, the circuit court of
Harrison had no jurisdiction of this cause, when it rendered
its decree ordering a sale of the land of Andrews, and, there-
fore, no right to render such decree, that neither the decree
of the court in this cause, nor anything in this opinion should
be regarded as upholding the decree of December 12, 1863,
ordering this sale, or the decree of March 26, 1864, confirm-
ing the same, as against Andrews." *Id.* 694.

The mandate of this Court was, on December 19, 1876,
entered in the circuit court of Harrison county and, on June
11, 1878, Andrews appeared and filed his answer in which
he states that, at the time this suit was brought and for
eighteen months prior thereto, he was an inhabitant of that
part of Virginia declared by the proclamation of the Presi-
dent of the United States to be in a state of insurrection,
that he was then an officer of the army of the Confederate
States within the military lines thereof engaged in war with
the United States and an enemy of the people of Harrison
county and so continued to the close of the war in 1865;
that by reason of his situation and the said insurrection and
civil war it was illegal for him to pay any money to the
plaintiff or appear in the said county of Harrison, and that
this suit could not be properly brought or maintained in this
Court against him, nor could any decree therein be pro-
nounced against him which would have any legal or binding
force, and he prays, therefore, "that the orders and decrees
rendered in this cause be set aside and vacated and the
amount for which he is liable as purchaser of said tract of
land to be ascertained by the court and when this is done he
is ready and willing to pay the same." Camdem, also, in
his answer stated, that he was ready and willing to pay the
amount of his lawful indebtedness to the plaintiff as soon

as the same should be ascertained.    To each of said answers there was a general replication by the plaintiff.

A number of depositions were taken by the defendants and filed in the cause in 1877, after the same had been remanded from this to the circuit court, by which it is clearly proved that both the defendants, Andrews and Camden, were from May, 1861, to the close of the war in 1865, absent from Harrison county, and that during the whole of that time Camden was an actual resident of that part of Virginia declared to be, and which was in fact, in insurrection against the government of the United States and within the military lines of the Confederate States; that Andrews was, also, a resident of that part of Virginia from 1861 to February 1864, when he went to Europe and afterwards, in 1867, he returned to Maryland where he has since resided; that from May, 1861, to February, 1864, he was an officer in the military service of the Confederate States, and that at no time during the war was he in any part of the territory which is now the State of West Virginia.

On January 17, 1874, Camden made and filed in the cause an affidavit that he could not truly make the affidavit prescribed by sec. 27 of ch. 106 of the Code of W. Va.—ch. 69 Acts 1872 p. 104.    And the cause, on December 29, 1880, came on to be heard upon the bill, exhibits and all the proceedings heretofore had therein, the answers of the defendants, Camden and Andrews, replications thereto, depositions, &c., and the court refused to set aside said decrees of December 12, 1863, and March 26, 1864, and after correcting the former decrees in conformity with the mandate of this Court, ascertained the balance due from Andrews and Camden to the plaintiff to be two thousand eight hundred and twelve dollars and sixteen cents with interest from December 10, 1880, and costs, declared the same to be a lien on the real estate of Camden attached in the cause and ordered that, unless the said debt and costs were paid within ninety days, the sheriff should sell sufficient of said real estate to pay the same.    From and to this decree the defendants Andrews and Camden were allowed an appeal and *supersedeas* by this Court.

*C. Boggess* for appellants.

*N. Goff* and *Edwin Maxwell* for appellee.

SNYDER, JUDGE:

The counsel for the appellee insist that this appeal should be dismissed as improvidently awarded and rely upon *Vance* v. *Snyder*, 6 W. Va. 24, 32, and *Meadows* v. *Justice, Id.* 198, which hold that a non-resident defendant against whom a decree has been rendered upon publication, and who has not appeared in the court below, is confined to the remedy prescribed by the statute and that he cannot in the first instance appeal from such decree. The correctness of the doctrine declared by these and many other decisions is unquestioned, but I cannot perceive what application or bearing it can have in this cause. It is true the decrees of December 12, 1863, and March 26, 1864, sought to be affected by this appeal were rendered upon publication or what was intended as such, but it is not true that the appellants did not appear in the court below. And while the appellant, Andrews, did not file a formal petition for a re-hearing in the mode prescribed by the statute as did Camden, still he appeared and filed his answer in the court below without objection and asked that said decrees should be set aside. This answer contains in effect, if not in form, substantially what a petition if filed should have stated and was, therefore, a sufficient compliance with the statute. The court having permitted him to appear and file his answer without giving security as the statute requires, and no objection having been then made by the appellee, it is too late for him to object for the first time in this Court for the want of such security. To make such objection here is to admit and invoke the jurisdiction of this Court for the correction of an alleged error in the court below. This cannot be done on a motion to dismiss for the want of jurisdiction. The reason of the rule which denies the right of a non-resident to appeal until he has submitted his defense to the inferior court is founded upon the legal principle that this is a Court of exclusively appellate jurisdiction, confined to the review of questions of law and fact which had been presented to and passed upon by the inferior court. In this cause the questions of the correctness and validity of the decrees complained of and the grounds

upon which they are claimed by the appellants to be erroneous, were fully submitted to the circuit court and by it considered and overruled. They are, therefore, now properly before this Court for review, and consequently the motion to dismiss this appeal must be denied.

This appeal, on the merits, presents but a single legal enquiry, and that is, did the circuit court err by its decree of December 29, 1880, in refusing to set aside the decrees of December 12, 1863, and March 26, 1864. These decrees having been heretofore, as we have seen, decided to be interlocutory, and they being the basis of the said decree of December 29, 1880, may be reviewed upon this appeal without reference to the lapse of time between their dates and the date of the decree of December 29, 1880, now appealed from: 9 W. Va. 687; *Cocke* v. *Gilpin*, 1 Rob. 20.

The appellants contend that said decrees should have been set aside because at the time, and for a long time before and after, this suit was instituted the circuit court of Harrison county had no jurisdiction to pronounce any decree against them for two reasons: *First*, because the cause of action of the plaintiff was suspended by the war then waging between the Confederate States and the United States; and *second*, they, being actual residents within the Confederate lines and said court being within the Federal lines, were not subject to the jurisdiction of said court, and therefore said decrees are *coram non judice* and utterly void as to them.

1. The legal consequences resulting from a state of war between two countries at this day are well understood, and will be found defined in every approved work on the subject of international law. The people of the two countries became immediately the enemies of each other—all intercourse, commercial or otherwise between them unlawful—all contracts existing at the commencement of the war suspended, and all made during its existence utterly void. "There is no authority in law, whether that law be national, maritime or municipal, for any kind of private, voluntary, unlicensed business communication or intercourse with an enemy. It is all noxious, and in a greater or less degree is criminal. Every attempt at drawing distinctions has failed; all kinds of intercourse, except that which is hostile, or created by the

mere exigency of the war and necessity of the case, is illegal. The idea that any remission of money may be lawfully made to an enemy, is repugnant to the very rights of war, which require the subjects of one county to seize the effects of the subjects of the other.   The property so remitted, if in cash or any tangible subject, would become a just cause of seizure while on its passage. *An alien enemy has no right of action during war, and he cannot sue,* because it would be drawing resources out of the country; how then can it be lawful to make remittances to him? *The law that forbids intercourse and trade must equally forbid remittances and payment."* Griswold v. *Waddington.,* 16 Johns. 438, 483; Halleck Int. Law 356 *et eq.*; 32 Eng. L. & Eq. 544, and note.

These principles have been fully recognized and applied by the Supreme Court of the United States to the late civil war between the United States and the Confederate States.   That court in *Mathews* v. *McStea,* says: "It is undeniable that civil war brings with it all the consequences in this regard which attend upon and follow a state of foreign war.   Certainly this is so when civil war is sectional.   Equally with foreign war, it renders commercial intercourse unlawful between the contending parties, and it dissolves commercial partnerships."    91 U. S. 10.

In *Brown* v. *Hiatts,* the court, speaking in reference to the late war, said: "It is sufficient to state that the war was accompanied by the general incidents of a war between independent nations; that the inhabitants of the Confederate States on the one hand, and of the loyal States on the other, became thereby reciprocally enemies of each other, and were liable to be so treated without reference to their individual dispositions or opinions; that during its continuance all commercial intercourse and correspondence between them were interdicted by principles of public law as well as by express enactments of Congress; that all contracts previously made between them were suspended; and, that the courts of each belligerent were closed to the citizens of the other."   15 Wal. 184.

Likewise, in *Ross* v. *Jones,* the court says: "Unquestioned right to sue is the *status* of the creditor if the contract was made during peace, but the effect of war is to suspend the

right, not only without any fault on the part of the creditor, but under circumstances which make it his duty to abstain from any such attempt. His remedy is suspended by the acts of the two governments and the law of nations, not applicable to the contract at its date, but which comes into operation in consequence of an event over which he has no control." 22 Wall. 586.

Also, in *Hanger* v. *Abbott,* the court says: "Better opinion is that executed contracts, such as the debt in this case, although existing prior to the war, are not annulled or extinguished, but the remedy is only suspended, which is a necessary conclusion, on account of the inability of an alien enemy to sue or to sustain, in the language of the civilians, *persona standi in judico.*" 6 Wall. 536.

Judge Blatchford, in the *Kanawha Coal Co.* v. *Ohio Coal Co.,* a case similar to the one now before us, uses this language: "The enforcement (of the debt) was indeed not by a judgment that the debtor personally pay the debt to the creditor, but was by a sale of land which the debtor had specifically put in trust to pay the debt. Nevertheless the foundation of the proceeding was that the debt existed and the debtor had not discharged it. The duties and rights of the creditor were correlative. The right which the creditor undertook to exercise by enforcing a sale of the land, was to compel the discharge of the debt *in invitum* by that means, so far as the proceeds of sale would go. This right could not exist in favor of the creditor unless there existed at the same time a corresponding duty and capacity on the part of the debtor to pay the debt to the creditor. The right of action that is suspended must include the right to resort to any species of proceedings, judicial or otherwise, to enforce the contract." 7 Blatch. 391, 408.

It follows, it seems to me, from these principles, when applied to the case at bar, that the appellants, who resided within the Confederate lines, could not lawfully pay the debt to the appellee residing within the Federal lines; and as the right to enforce the vendor's lien depended upon the present duty of the debtor to pay and the right of the creditor to receive payment of the debt, the right to enforce said lien as well as the right to collect the debt was suspended. The

debtors were positively prohibited and interdicted from making such payment by the laws of their country and the laws of nations. There being no duty to pay or right to collect there could be no cause of action or right to sue. There can be no cause of action upon a debt which the debtor is forbidden by law to pay and which the creditor has no present legal right to collect. The law cannot create a default when it forbids a performance. The injustice of attaching and selling the property of debtors for a debt, which they are forbidden by law to pay, is too obvious to admit of question or justification. Their right to pay the debt and release their property is commensurate with that of the creditor to enforce his lien or attach and sell the property. If the one is suspended by law, justice and reason as well as the law require that the other should not be exercised. *Walker* v. *Beauchler*, 27 Gratt. 511.

The plaintiff, the appellee, here, having no cause of action or right to sue at the time he instituted this suit against the appellants, the decrees and all the proceedings had in the cause are without legal sanction or authority and void as to them.

2. As to the second ground relied on by the appellants. Jurisdiction is indispensable to the validity of all judicial proceedings. There are two elements of jurisdiction; first, that of the subject-matter, and, second, that of the person or thing against which the judgment or decree operates. The first is conferred by the Constitution and laws of the State or country in which the courts are situate, and consists of the power to hear a particular class of cases, or to determine controversies of a specified character. The second is conferred by the consent of the person or obtained in the manner prescribed by law. Both elements are pre-requisite and must exist before the court can render a valid judgment or decree, and if either is wanting all subsequent proceedings are void however regular they may be. These principles are elementary and require no citation of authorities to verify them.

The circuit court of Harrison, being by law a court of general jurisdiction, there can be no question that it had rightful jurisdiction over the subject-matter of this cause. The

only question then open for enquiry is, whether said court obtained jurisdiction over the persons of the appellants or the land subjected to sale by it? It is not pretended that there was any consent by the appellants, consequently, if it acquired jurisdiction it must have done so in the manner prescribed by law, as that is the only other mode in which rightful jurisdiction could be acquired. Two modes of obtaining jurisdiction over the person are prescribed by law and both of them are statutory in this State. The one is by summons served on the defendant, and the other, which is applicable alone to non-residents or unknown defendants, is by order of publication. It is not claimed that there was any personal service on the appellants here, but it is claimed that the appellants were non-residents and as such proceeded against by order of publication and attachment upon their property. To sustain this claim the counsel for the appellee rely upon the act of the General Assembly, passed February 10, 1862, by the re-organized government of Virginia at Wheeling. Acts of 1861–2 p. 39.

The first section of said act relates exclusively to persons voluntarily leaving their usual places of abode and *going into the armies* of the Confederate States, while the second is much broader and applies to any person reputed to be in sympathy with the Confederate States voluntarily leaving their usual places of abode and going out of reach of civil process issuing from the county in which they last resided. But each of said sections limits the right to proceed against such persons by attachment or otherwise to the manner provided by law for proceeding against non-residents.

The mode then prescribed by law for proceedings against non-residents is found in the Code of Virginia chapter 170, sections 10 to 13 inclusive, and declares that, upon affidavit of the non-residence of a defendant, an order of publication, stating briefly the object of the suit, may be taken requiring such defendant *to appear* within one month, after the due publication of such order, for four successive weeks in a newspaper, and do what is necessary to protect his interests. These, and other provisions of the statute which it is not necessarry to repeat, plainly show that the purpose of the publication is to furnish such absent defendant an opportu-

nity of being informed of the object of the suit in order that he may appear and protect his interests. This being a proceeding that has no sanction in the general law, but wholly the creation of the statute, which prescribes not only the effect but also the occasions and manner of its use; and moreover, being in derrogation of the common law as well as liable to be abused and used oppressively, it must be construed strictly and confined rigidly within the prescribed limits of the statute and not be allowed in cases which do not clearly come within the spirit as well as the letter. It must be taken then that the Legislature by prescribing a publication intended that such publication should have some effect, and it could not have contemplated that it would be resorted to in order to confer jurisdiction over persons who could neither legally see nor respond to it. A publication in such case would be an idle form which had better be omitted altogether, and the Legislature by requiring it would be guility of an absurdity. The statute, in attachment cases, such as the one before us, provides for notice by publication as well as the seizure of the property. The publication is in the nature and intended as a substituted service of process on the defendant. This notice is a condition precedent and must be published before the court can acquire full jurisdiction to make any order or decree affecting the defendant or disposing of the attached property. As to persons who cannot legally see or obey it, the publication is without any legal effect or validity whatever. *Grinnan* v. *Edwards*, 21 W. Va. 347.

The Supreme Court of the United States in *Dean* v. *Nelson*, 10 Wall. 172, held that judicial proceedings, during the war to foreclose a mortgage, when taken within the Union lines while the defendants were absent in the Confederate lines and prohibited from entering the Union lines, were void. The Court said: "The defendants in the proceedings were within the Confederate lines at the time, and it was unlawful for them to cross those lines. Two of them had been expelled the Union lines by military authority, and were not permitted to return. The other, Benjamin May, *had never left the Confederate lines.* A notice directed to them and published in a newspaper was a mere idle form. They could

not lawfully see nor obey it. As to them, the proceedings were wholly void and inoperative." This language was quoted, approved and applied in *Lasere* v. *Rochereau,* 17 Wall. 439.

It has been argued, however, that the principles involved in these decisions have no application to the case of a debtor who voluntarily left his home, in the Union lines, during the war, for the purpose of residing within the Confederate lines, and thus, as alleged, by his own act disabling himself from performing his contracts. The cases of *Ludlow* v. *Ramsey,* 11 Wall. 581; *Masterson* v. *Howard,* 18 *Id.* 99; *University* v. *Finch, Id.* 106; and *McQuiddy v. Ware,* 20 *Id.* 14, are referred to in support of this position.

An examination of these cases will show that the points actually decided in them have but an indirect bearing on the doctrine of *Dean* v. *Nelson.*  *Masterson* v. *Howard* was a suit brought in the federal court in Texas *before the commencement* of the war, and in which a final decree was entered in June, 1866, *after the close* of the war but before the President's proclamation of August 20, 1866, announcing the close of the war in that State, and it was decided that the plaintiffs had a right to proceed with their suit so soon as the courts were opened, whether official proclamation had been made or not of the cessation of hostilities, and that the court had authority to enter said decree of June, 1866. The court expressly declares, in its opinion, that the existence of the war closed the courts of each belligerent to the citizens of the other, "but that it did not prevent the citizens of one belligerent from taking proceedings for the protection of their own property in their own courts, against the citizens of the other, *whenever the latter can be reached* by process." 18 Wall. 105. This case is in support rather than in conflict with *Dean* v. *Nelson.* It decides by strong implication, if not directly, that no suit can be brought by the citizens of one belligerent against those of the other, unless the parties and the court in which the suit is brought are within the territory of the same belligerent. For otherwise, the party sued could not be reached by process which this case decides is essential. In *Ludlow* v. *Ramsey,* the court does state that the doctrine of *Dean* v. *Nelson* does not apply to a

person who went and voluntarily remained in rebellion, but that case, as also the case of *McQuiddy* v. *Ware,* was a collateral suit to set aside a decree made in another cause, and not a direct proceeding, like the one at bar, to set aside a sale made in the same cause. In *University* v. *Finch,* Miller, Justice, in delivering the opinion of the court, says: "The case before us was not one of a sale by judicial proceeding. No aid of a court was needed or called for. It was purely the case of the execution of a power by a person in whom a trust had been reposed in regard to real estate, the land, the trustee and the *cestui que trust* all being, as they had always been, within a State whose citizens were loyally supporting the nation in its struggle with its enemies." 18 Wall. 108. It is apparent from this statement that the court did not regard the question now under discussion at all involved in that case, and it is expressly stated in the opinion that the court does not intend to overrule, but approves the doctrine of the cases of *Dean* v. *Nelson* and *Lasere* v. *Rochereau.* It is not overlooked, however, that the opinions in the cases under review contain *dicta* in conflict with the decision in *Dean* v. *Nelson,* but the sectional bias, which is, perhaps, natural and, therefore, excusable, but which we do not feel and are not bound to sustain, by which those *dicta* are characterized, tend greatly to lessen their weight as authority especially when viewed from the standpoint of a disinterested party or those on the reverse side. To such they very forcibly suggest, if they do not appear seriously to maintain, the doctrine, that refugees from the loyal to the disloyal States have no rights which the federal courts are bound to respect.

But conceding these cases do make the distinction and hold that a debtor, who was expelled from the Union lines for disloyalty, is not bound by judicial proceedings had against him in his absence, while one who left the Union lines and voluntarily remained in the south, is bound by such proceedings taken in his absence, still they cannot rule the case before us; because the record here does not disclose facts upon which such a distinction can be predicated. It does not appear that either of the appellants voluntarily left his residence in the Union lines, nor does it show under what circumstances or for what purpose they left; but it

does show that neither of them resided in the Union lines, at any time during the war, after the date of proclamation of the President of August 27, 1861, establishing non-intercourse and the cessation of all business relations between the people of the respective belligerents, which date the Supreme Court of the United States has declared and fixed as the time of the legal commencement of the war. *Matthews* v. *McStea*, 19 U. S. 7, 10. The appellants, living within the Confederate lines when this proclamation was issued, were declared by it to be enemies of the people of the loyal States as fully and completely as those who had always resided in the south. All the people who then resided in the disloyal States were equally declared to be in insurrection and enemies of the government of the United States without reference to the time when they went south or the individual opinions held by them. It is true, those who recently went there had the privilege of returning to the Union lines and remaining there if they so desired, but this privilege was likewise extended to any other resident of the south and many of them availed themselves of it by going north and remaining there during the whole war. Not only did many of them do so at the commencement of the war, but they continued to do so during the progress of the war and as the territory of the confederacy was encroached upon by the federal forces, and their right to do so was never questioned by the federal authorities. Thus in one sense every resident of the south voluntarily remained there during the war. Unless, therefore, a distinction can be legally made between the residents of the north and the south as to the right of electing to which side of the conflict they would adhere, residents of the north had the same legal right to go south and adhere to the confederacy that the residents of the south were conceded to have to go north and adhere to the federal government. No such distinction can be legally established. The right of election must necessarily exist in all civil wars, and it pertains equally to the residents of either side of the conflict. It was fully recognized in our war for independence and it is a principle so well established that it is unnecessary to review the authorities in support of it. *Inglis* v. *Trustees, &c.*, 3 Pet. 99; 2 Dall. 234; 20 Johns. 332; 2 Pick. 394; 2 Kent's Com. 49.

The effort to make a distinction between the legal rights of the residents of the south during the war and those of the north, or to impose disabilities on one class of residents of the south which do not attach to other classes of such residents, cannnot exist in law or reason. *Walker* v. *Beauchler*, 27 Gratt. 511. If, therefore, the *dicta* contained in the opinions of the Supreme Court of the United States, which we have been considering, countenance any such distinction, as they seem to do, they are not only unsupported by the well established principles of international law and reason, but they are in positive conflict with the doctrines announced and repeatedly sanctioned by that Court in other and better considered cases. It has decided that the late conflict was a civil war, and as such the belligerents on either side occupied the same relation to each other that exists between independent nations engaged in war, and that every citizen of the one belligerent was an enemy of every citizen of the other belligerent without regard to his individual dispositions and opinions. *The Prize Cases*, 2 Black 635; *Mrs. Alexander's Cotton*, 2 Wal. 404; *The William Bagaley*, 5 *Id.* 377; *Hanger* v. *Abbott*, 6 *Id.* 532; *Billgerry* v. *Branch*, 19 Gratt. 417.

Conceding these legal principles there can be no room for such attempted distinctions. A citizen of the loyal States who, on account of his disloyal sentiments and sympathies, is by military force sent south, while he remains there is no less, in law, an enemy of the people of the loyal States than if he had been born and always resided there. And a native born inhabitant of the south remaining there during the war is no less an enemy of the people of the loyal States than an inhabitant of the north who elected to adhere to the fortunes of the south and voluntarily went and remained there during the war. It is the residence of the citizen and not his "individual dispositions or opinions," or the time, causes, circumstances or purposes of his becoming such resident, that makes him an enemy. In a war between independent nations the *status* of all the citizens or subjects of the one nation toward the other is the same—no degrees of guilt or punishment are recognized—they are all liable to the same treatment, and all are equally enemies and nothing more nor

less. Likewise in a civil war where residence must take the place of citizenship or nationality, there can properly be no degrees. The residents of the one belligerent are all necessarily, in the same degree, equally enemies of the other. Before the commencement of the civil war each citizen of the entire republic owed the same duties and allegiance to the common government. The existence of the war, as we have seen, gave to each citizen, regardless of his then residence, the right to elect the side to which he would adhere. If, therefore, at, or even after, the commencement of hostilities a resident of one section exercises this necessary right and goes to and remains voluntarily in the opposite section, his offence can be no greater than if, being a resident of the section of his choice, he voluntarily remains there and adheres to that section. In either case his election is voluntary, and the law makes him an enemy of the other section without reference to his individual opinions. He elects his residence and from that the law fixes his status of enemy to the opposite belligerent. If a resident of the south had gone north and voluntarily remained there, as many did, during the war, and his property had been seized and sold for debt in his absence by a court of the south without service of process or notice except by a publication which he could neither legally see or obey, can any one doubt that such a sale would be declared a nullity by any State or Federal court in the north or south? *Livingston* v. *Jordan,* Chase's Dec. 454. Then by what process of reasoning or principle of law can a proceeding of the same character in a loyal court against a citizen, who goes south and voluntarily remains there, make a valid sale? If a person sent south, on account of his disloyalty, cannot be sued during his absence, upon what principle or logic, can a person who goes south and voluntarily remains there, be sued in his absence? Both are enemies and neither can appear to defend the suit without subjecting himself to arrest and the loss of his liberty. By the court process he is commanded to appear and at the same time he is by the law forbidden to see the process or enter the territory over which the court exercises its jurisdiction. If a valid decree can be entered upon a notice which the defendant can neither see nor obey, then notice must be immaterial,

and an equally valid decree could be rendered without any notice or process whatever.   But it ha's been held that a decree pronounced, even in confiscation proceedings, by the government against a person without hearing him, or giving him an opportunity of being heard, is not a judicial determination of his rights, and is not entitled to respect in any other suit or court.   *Windsor v. Mc Veigh,* 93 U. S. 274;   *U. S. v. Mc Veigh,* 11 Wall. 259;   *Underwood v. Mc Veigh,* 23 Gratt. 409;   *Fairfax v. City of Alexandria,* 28 *Id.* 16.

In these cases McVeigh, the party whose property had been sold, had, up to the occupation of Alexandria by the federal forces, been a resident of that city, and that just before its occupation he voluntarily left there and went south and entered the service of the Confederate States.   His status, therefore, towards the loyal people and courts was precisely the same as that assumed for the defendants in the *dicta* of the court in *Ludlow v. Ramsey,* and the other similar cases before referred to, yet in these *Mc Veigh* cases no attempt is made to distinguish his status from that of any other resident of the Confederate States.   On the contrary the court held that the proceedings against him were absolutely void and that an order striking his answer from the files, in effect, denied him a hearing.   If the striking out of the answer of a defendant who voluntarily went south and remained there during the war renders the proceedings against him and his property void, the publication of a notice which he cannot legally see nor' answer, can be certainly no less prejudicial to his rights, and the proceedings in such case must be equally void.   In either case the defendant is utterly powerless to protect his interests and the effect is the same as if no attempt had been made to give him notice.   If the doctrine claimed for the case of *Ludlow v. Ramsey* and others of that class, *supra,* had been applied to McVeigh, who voluntarily left home to engage in rebellion, the court in his cases would have denounced him as "a man, who chose to neglect his private interests for the pupose of devoting his time to the destruction of the government, complaining that his creditors enforced the collection of their debts on a wrong theory of his status, in consequence of entering the service of the enemy"—20 Wal. 17,—and given judgment against him and

ordered a sale of his property; but instead of so doing, the court indignantly declared that to act thus "would be a blot upon our jurisprudence and civilazation    It would be contrary to the first principles of the social compact and the right administration of justice."    11 Wal. 267.

It can be further said that if the distinction sought to be maintained were admitted, then this result would necessarily follow, that the statute of limitations would be suspended during the war on  debts against a person sent into the enemy's lines, while it would continue to run in favor of one voluntarily going there.    For the sole ground upon which claims against an enemy are exempted from the operation of said statute during a state of war, is the impossibility of sueing on such claims during the war.    *Hanger* v. *Abbott*, 6 Wal. 532–39.    If, therefore, the enemy debtor may be sued and judgment had·against him notwithstanding the existence of war then the ground for the suspension of the statute does not exist and no suspension can be allowed in such case. Thus the effect of the distinction contended for would be to give the voluntary rebel the benefit of the statute to bar his debts and at the same time deny it to the enforced and, perhaps, the less culpable offender.    This is not the law and it has not been so declared by the Supreme Court of the United States.

In *Brown* v. *Hiatts*, 15 Wal. 177, that court held :   "1. Statutes of limitations of the several States did not run during the late civil war  against the right  of action of parties upon contracts made  previous to,  and maturing after,  the commencement of the war; 2. Interest on loans made previous to, and maturing after, the commencement of the war ceased to run during the subsequent continuance of the war, although interest was stipulated in the contract; 3. These doctrines held in a case  where a mortgagee, who was a citizen and resident of Virginia, *one of the Confederate States*, brought a suit, after the close of the war, upon a bond and mortgage executed by citizens of Kansas, *one of the loyal States*, previous to the war, but which matured a month after the commencement of the  war."

And in *Ross* v. *Jones*, 22 Wal. 576, the same court held: "The late civil war was flagrant in Arkansas from April,

1861, till April, 1866, and the statutes of limitations did not run during that term. This principle applies to suits between persons in different States of the late so-called Confederate States of America, as much as to suits between citizens of States of the north, which remained loyal, and citizens of the said so-called Confederate States, with which they were at war." And in the opinion, the court says: "Attempt has been made to distinguish the case before the court from the case in which that rule of decision was first promulgated by this court, but it is clear that the attempt must be unsuccessful, as the same doctrines have since been applied in a case where a mortgagee, who was a citizen and resident of one of the Confederate States, brought a suit after the close of the war upon a bond and mortgage executed prior to the war by citizens of one of the loyal States, and the court held that the period from the proclamation of the blockade to the proclamation that the war was closed, must be deducted in the computation of the time which the statute of limitations of the loyal State had run against the right of action." 22 Wal. 586.

In these cases the court makes no enquiry as to the time or manner in which the Confederate suitors became residents of the south, but in general terms declares that the doctrines announced apply equally and without distinction to all classes of suitors whether loyal or disloyal.

Considering the general rules and principles, defining the status, rights, obligations and disabilities of the respective belligerents in the late war, announced in these and other cases by the Supreme Court of the United States, it seems to me, that it is better to adhere to them in all cases than to attempt to draw distinctions which have no sanction in reason or justice, and leading to perplexing investigations into the motives and manner by which different persons were actuated and acquired the relation of enemies to each other. As the creditor was forbid to receive, and the debtor to pay, by the supreme power, each was relieved from all penalties, forfeitures and damages incident to the non-performance and the non-enforcement of the contract, and that too without regard to the particular time or circumstances under which they were placed in the attitude of enemies to each other.

If we hold it to be the duty of the citizen to obey the laws of the government under which he lives, and to have no communication with its enemies, obedience to that law ought not to impose upon him the loss or sacrifice of his property, especially in a proceeding by a private person to enforce a private demand, the right to enforce which was positively forbidden and suspended by the public interests, and by the supreme law of the very court which attempts to enforce it. This accords with the dictates of enlightened public policy, international law and with humanity and justice. *Walker* v. *Beauchler*, 27 Gratt. 511.

Upon these authorities and for the reasons stated, we think no distinction founded on justice, reason or correct legal principles, can be drawn between the capacities, rights and liabilities of a debtor sent into the Confederate lines for disloyalty, and one voluntarily going there because he had the patriotism and manliness to make sacrifices, as well as professions, and to abandon even his home to discharge what he believed to be his duty and uphold his principles by his acts; and, consequently, the cases of *Ludlow* v. *Ramsey*, *University* v. *Finch* and *McQuiddy* v. *Ware*, *supra*, so far as they countenance or attempt to make any such distinction and qualify the doctrine announced and applied by the Supreme Court of the United States in *Dean* v. *Nelson* and *Lasere* v. *Rochereau*, *supra*, are disapproved.

In *McVeigh* v. *United States*, the court says: "Whatever may be the extent of the disability of an alien enemy to sue in the courts of the hostile country, it is clear that he is liable to be sued, and this carries with it the right to use all means and appliances of defence"—11 Wal. 267.

The same court in *University* v. *Finch* says, referring to this quotation, that "the case of *McVeigh* v. *United States*, holds that an alien enemy may be sued though he may not have a right to bring suits in our courts"—18 Wal. 111.

The counsel for the appellee rely upon this as authority to prove that an enemy in our late civil war may be sued in the loyal courts whether he can be reached or not by process or publication; because, if the right to sue an enemy is shown, and all enemies being forbidden by law to see or obey any process from the enemy courts, the conclusion is that he may

be sued without notice or publication.    This is an entire
misconstruction of the law.    In a war between independent
nations an *alien* enemy *resident* in the country may sue and be
sued as in time of peace.    "For," says Kent, "protection to
their persons and property is due, and implied from the per-
mission to them to remain without being ordered out of the
country by the President of the United States.    The lawful
residence does, *pro hac vice*, relieve the *alien* from the charac-
ter of an enemy, and entitles his person and property to pro-
tection"—2 Kent's Com. 63; citing *Clark* v. *Morey*, 10 Johns.
69 and *Russell* v. *Skipwith*, 6 Bin. 241, the same cases cited by
the court in *Mc Veigh* v. *United States* as authority for the
quotation above given.

That such is the correct doctrine is unquestionable, but it
has no application to *non-resident* enemies, or enemies resi-
dent in the enemies' country, absent from the country in
which the suit is brought.    Nor can it have any application
in a civil war such as our late war; because in such war
there can be no *alien* enemies.    All the people on either side
are at the commencement of hostilities citizens of the same
common nation or country, and their subsequent status as
enemies of each other is determined by their residence, and
that alone, in the territory of the one or the other belliger-
ent.    In whichever section he elects to reside, he remains a
*citizen* of that section and by law becomes an enemy of the
opposite section, and in neither section can he become by
residence, private opinions or otherwise, a resident *alien*
enemy.    Necessarily, therefore, and according to all the
authorities, one belligerent cannot in the courts of his coun-
try or section sue his enemy resident in the hostile country
or section where he cannot be legally reached by the process
of the court.

But the appellee further insists that the aforesaid act of
February 10, 1862, under which this suit was instituted, was
enacted to meet the precise case of a person who had left
his usual place of abode and gone, as the appellants did in
this case, beyond the reach of the process of the loyal courts
into the Confederate lines; and, consequently, it was not
intended by the Legislature that the jurisdiction should be
affected by the laws of war which prevented such person

from seeing or responding to the order of publication therein provided for, but that the suit must be regarded as purely a proceeding *in rem.* against the property attached.

If, as claimed, the Legislature by said statute intended to confer jurisdiction without notice or what is the same, in effect, by a publication which it was not intended or contemplated the defendant should see or have the power to obey, then in that respect the act is, as we have seen, but an idle form and invalid. This brings us to the final enquiry, whether or not, regarding this suit as purely a proceeding *in rem.* against the attached property, it can be maintained without notice to or legal publication against the appellants and an opportunity afforded them to be heard?

In *Windsor* v. *McVeigh*, 93 U. S. 274, the court held that: " A sentence of a court, pronounced against a party without hearing him, or giving him an opportunity to be heard, is not a judicial determination of his rights, and is not entitled to respect in any other tribunal." In the opinion in the same case the court says: " The position of the defendant's counsel is, that, as the proceeding for the confiscation of the property was one *in rem.*, the court, by seizure of the property, acquired jurisdiction to determine its liability to forfeiture, and consequently had a right to decide all questions subsequently arising in the progress of the cause; and its decree, however erroneous, cannot, therefore, be collaterally assailed. In supposed support of this position, opinions of this court in several cases are cited, where similar language is used respecting the power of a court to pass upon questions arising after jurisdiction has attached. But the preliminary proposition of the counsel is not correct. The jurisdiction acquired by the court by seizure of the *res* was not to condemn the property without further proceedings. The physical seizure did not of itself establish the allegations of the libel, and, therefore, could not authorize the immediate forfeiture of the property seized. A sentence rendered simply from the fact of seizure would not be a judicial determination of the question of forfeiture, but a mere arbitrary edict of the judicial officer. The seizure in suits *in rem.* only brings the property seized within the custody of the court, and informs the owner of that fact. The theory of the law is, that all

property is in the possession of its owner, in person or by agent, and that its seizure will, therefore, operate to impart notice to him. Where notice is thus given, the owner has the right to appear and be heard respecting the charges for which the forfeiture is claimed. That right must be recognized and its exercise allowed before the court can proceed beyond the seizure to judgment. The jurisdiction acquired by the seizure is not to pass upon the question of forfeiture absolutely, but to pass upon that question after opportunity has been afforded to its owner and parties interested to appear and be heard upon the charges. To this end some notification of the proceedings beyond that arising from the seizure, prescribing the time within which the appearance must be made, is essential. Such notification is usually given by monition, public proclamation, or publication in some other form. The manner of the notification is immaterial, but the notification itself is indispensable." 93 U. S. 278–9; *Bradstreet* v. *Neptune Ins. Co.*, 3 Sumn. 601.

In another part of that opinion, quoting approvingly from the opinion of Mr. Justice Story in *Bradstreet* v. *Neptune Ins. Co.*, *supra*, the court says: "It is a rule founded on the first principles of natural justice, that a party shall have an opportunity to be heard in his defence before his property is condemned, and that charges on which the condemnation is sought shall be specific, determinate and clear. If a seizure is made and condemnation is passed without the allegation of any specific cause of forfeiture or offence, and without any public notice of the proceedings, so that the parties in interest have no opportunity of appearing and making a defence, the sentence is not so much a judicial sentence as an arbitrary sovereign edict. It has none of the elements of a judicial proceeding, and deserves not the respect of any foreign nation. It ought to have no intrinsic credit given to it, either for its justice or for its truth, by any foreign tribunal. It amounts to little more, in common sense and common honesty, than the sentence of a tribunal which first punishes and then hears the party, *castigatque auditque.*   *   *   *   *   It tramples under foot all doctrines of international law, and is but a solemn fraud, if it is clothed with all the forms of a judicial proceeding." *Id.* 280, 281.

"In another part of the same opinion the judge, (Story), characterized such sentences as mere mockeries, and as in no just sense judicial proceedings, and declared that they ought to be deemed, both *ex directo in rem.* and collaterally, to be mere arbitary edicts or substantial frauds." *Id.* 281; *Woodruff* v. *Taylor*, 20 Vt. 65.

This language, it is true, is used with respect to proceedings *in rem.* for the confiscation of property by a Federal court, but if it is applicable in such cases where the government institutes the proceedings, it is equally, and for stronger reasons, applicable and pertinent to proceedings *in rem.* by attachment instituted by a private individual for a private purpose. It has a direct bearing upon, and is a conclusive answer to, the position contended for by the appellee in the case at bar.

In every view, therefore, it seems to me, that the circuit court of Harrison county, by proceeding without an opportunity to the appellants to be heard and at a time when they were so situated that they could neither legally see nor obey any publication that may have been made against them, never acquired jurisdiction over the appellants to render the aforesaid decrees of December 12, 1863, and March 26, 1864, and that, consequently, the said court by its decree of December 29, 1880, erred in refusing to set aside said decrees and the sale made and confirmed thereunder, the said decrees and sale being inoperative and void.

But the appellants, having appeared and filed their answers, subsequent to the rendition of said decrees, in which, after asserting that the court had acquired no jurisdiction as to them and objecting to all the proceedings theretofore had in the cause and praying that the same might be set aside and declared inoperative as to them; pray that the amount for which they are liable on account of the purchase-bonds executed by them for the tract of eight hundred and nineteen acres of land in the bill mentioned, may be ascertained by the court; that they are ready and willing and offer to pay the same with the permission of the court as soon as the amount can be so ascertained. By thus appearing and praying for an account and offering to pay any balance ascertained by the court in the cause to be due from

them on said purchase, the appellants from the time they so appeared submitted themselves to the jurisdiction of the court, and thereby waived the want of jurisdiction as to all the proceedings had in the cause, excepting so much thereof as they then objected to and asked to have set aside and declared void. The Court is, therefore, of opinion that the said decrees of December 12, 1863, and March 26, 1864, and the sale made and confirmed thereby are null and void, and that the said decree of December 29, 1880, in so far as it affirms said decrees and also in all other respects, except in so far as it carries into effect the instructions contained in the decree entered by this Court on November 2, 1876, must be reversed, set aside and annulled with costs to the appellants against the appellee, Luther Haymond, trustee.

The court is further of opinion that James Lynch, by becoming the purchaser of the tract of eight hundred and nineteen acres of land sold, became a party from that time to this suit in such manner as to subject him to the jurisdiction of the court and render him liable to its subsequent orders; and that he, in like manner, acquired rights in regard to the subject matter of litigation which the court is bound to respect—*Blossom* v. *Railroad Co.*, 1 Wal. 655; *Kable* v. *Mitchell*, 9 W. Va. 507.

The court is further of opinion that according to the principles of equity applied in the case of *Hudgin* v. *Hudgin*, 6 Gratt. 320, the said Lynch, as purchaser of said eight hundred and nineteen acres of land, is entitled to be substituted to the lien of the plaintiff on the said land to the extent and for the amount he may have paid to the plaintiff on his debt as such purchaser, subject however to a credit thereon for the use and rents and profits of the said land from the time he was entitled to the possession thereof until he surrenders or is evicted from the said possession; and that after deducting said rents and profits less the taxes paid from the sum paid by said Lynch, any balance due him shall be a charge against said land; and so likewise any unpaid balance that may remain due to the plaintiff, after crediting the purchase-money paid him by said Lynch, and any rents which accrued before the sale or any money paid to him by the garnishees, shall also be a charge against said land, and the appellants shall

also be liable to the plaintiff for the same on their bonds to him, but the costs of the sale of said lands made in 1863, shall in no manner be charged upon said land nor to the appellants, but shall be paid by the plaintiff. And the said circuit court should refer this cause to a commissioner to take and state an account showing the amounts due to and from the respective parties according to the principles herein stated. It is therefore ordered that this cause be remanded to the said circuit court, with directions to refer the same to a commissioner to report upon the matters hereinbefore indicated, or any other proper matter, and for other and further proceedings to be had therein according to the principles announced in this opinion, and the rules and practice of courts of equity.

THE OTHER JUDGES CONCURRED.

REVERSED—CAUSE REMANDED.